# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

NANCY ENGLAR, et al.,

                Plaintiffs,

vs.

CHIEF JUDGE LINDA DAVIS
*of the 41 District Court, individually and in
her official capacity.*

                Defendant.

_____/

Civil Action No.
04-CV-73977, 04-CV-73957

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

## OPINION AND ORDER
### (1) DENYING DEFENDANT'S MOTION TO AMEND THE JUDGMENT REGARDING DAMAGES (Dkt. No. 171); and
### (2) DENYING DEFENDANT'S MOTION FOR CLARIFICATION/RELIEF FROM JUDGMENT OR ORDER (Dkt. No. 199)

The trial in this matter concluded with a jury verdict in Plaintiffs' favor on January 27, 2012.

On February 24, 2012, Defendant Chief Judge Linda Davis filed a Motion for Judgment As a Matter

of Law, and a Motion for New Trial or to Amend the Judgment Regarding Damages. (Dkt. Nos. 169

and 171.) Plaintiffs filed Responses to both motions on April 2, 2012. (Dkt. Nos. 183 and 184.)

Defendant filed Replies on April 16, 2012. (Dkt. Nos. 187 and 189.)

On December 3, 2012, the Court entered an Opinion and Order Denying Defendant's Motion

for Judgment As a Matter of Law, and Denying in part Defendant's Motion for New Trial or to

Amend the Judgment Regarding Damages. (Dkt. No. 198.) The Court stated that it would decide

Defendant's Motion to Amend the Judgment Regarding Damages subsequently. (Dec. 3, 2012 Op.

and Order at 2.) On December 20, 2012, Defendant filed a Motion for Clarification/Relief from

Judgment or Order. (Dkt. No. 199.) Defendant's Motion for Clarification was directed to the Court's December 3, 2012 Opinion and Order, specifically with regard to the Court's rulings on Defendant's Motion for New Trial.

This Opinion and Order decides the remainder of Defendant's Motion for New Trial or Motion to Amend the Judgment Regarding Damages.

## I. BACKGROUND

The Court adopts the procedural and factual background set forth in the Court's December 3, 2012 Opinion and Order at pages 2 through 9.

On January 27, 2012, the jury returned a verdict against Defendant and in favor of all three Plaintiffs, awarding total damages of $2,277,688. (Jury Verdict Form, Dkt. No. 149.) The jury's award broke down as follows:

- Plaintiff Nancy Englar:
    Economic loss - $508,927
    Non-economic loss - $150,000
    Punitive damages - $160,000

- Plaintiff Carol Diehl:
    Economic loss - $455,849
    Non-economic loss - $150,000
    Punitive damages - $160,000

- Plaintiff Patricia Barachkov:
    Economic loss - $382,912
    Non-economic loss - $150,000
    Punitive damages - $160,000

(Jury Verdict Form at 2-3.)

Now before the Court are Defendant's Motion for New Trial or Motion to Amend the Judgment Regarding Damages, and Defendant's Motion for Clarification.

## II. LEGAL STANDARD

2

Defendant seeks a new trial pursuant to Federal Rule of Civil Procedure 59(a). A court "may grant a new trial only when a jury has reached a seriously erroneous result." *Henry v. Quicken Loans, Inc.*, 698 F.3d 897, 899 (6th Cir. 2012). A seriously erroneous result occurs "when the verdict is against the great weight of the evidence or the trial is influenced by prejudice or bias." *Lowery v. Jefferson County Bd. of Educ.*, 586 F.3d 427, 432 (6th Cir. 2009) (citation and internal quotations omitted).

Defendant also seeks to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e). The grant or denial of a Rule 59(e) motion is within this Court's "informed discretion[.]" *Scotts Co. v. Central Garden and Pet Co.*, 403 F.3d 781, 788 (6th Cir. 2005). "A district court may alter or amend a judgment under Civil Rule 59(e) to correct a clear error of law; acount for newly discovered evidence or an intervening change in the controlling law; or otherwise prevent manifest injustice." *Heil Co. v. Evanston Ins. Co.*, 690 F.3d 722, 728 (6th Cir. 2012).

### III. ANALYSIS

**A. Inadequacy of State Law Remedies**

Defendant argues that she is entitled to a new trial or judgment as a matter of law, because Plaintiffs failed to plead or prove inadequacy of state law remedies to redress their due process violations. Defendant principally relies on *Jefferson v. Jefferson County Public School System*, 360 F.3d 583 (6th Cir. 2004), which held in pertinent part as follows:

> we agree with the district court that plaintiff's procedural due process claim based on the deprivation of a property interest in her job also fails because she has not shown that state remedies under Kentucky teacher tenure and breach of contract statutes and cases are inadequate or incapable of remedying the wrongs she alleges. Such a showing of defective state remedies is required in procedural due process cases like this one.

3

*Id*. at 585 (citing *Hudson v. Palmer*, 468 U.S. 517 (1984); *Victory v. Walton*, 721 F.2d 1062, 1065-66 (6th Cir. 1984)).

Plaintiffs assert that *Jefferson* is no longer good law, citing *Mitchell v. Frankhauser*, 375 F.3d 477 (6th Cir. 2004), which noted the distinction between deprivations resulting from "random, unauthorized acts and established state procedures." *Id*. at 483. In *Mitchell*, the Sixth Circuit held that pleading inadequacy of state-law remedies only applies in cases where the plaintiff's property interest was deprived "pursuant to a random or unauthorized act." *Id*. at 484.

Defendant does not dispute the holding in *Mitchell*. Rather, Defendant argues that Plaintiffs' procedural due process claim arises out of an alleged random, unauthorized act, and thus requires pleading inadequacy of state-law remedies. Specifically, Defendant argues that Plaintiffs have not alleged that their due process violation was caused by any established state procedure that was itself procedurally deficient. *See Macene v. MJW, Inc.*, 951 F.2d 700, 706 (6th Cir. 1991) (holding that a plaintiff is not required to plead and prove inadequacy of state-law remedies "[w]hen a plaintiff directly challenges established state procedures[.]"). Defendant asserts that their claim must therefore arise out of a random, unauthorized act.

Defendant's argument is unavailing because Plaintiffs' terminations were not the result of a random, unauthorized act. The Sixth Circuit addressed an analogous situation in *Silberstein v. City of Dayton*, 440 F.3d 306 (6th Cir. 2006). In that case, the plaintiff was a city employee in a position classified as "just cause." Defendants terminated her employment without a pre- or post-deprivation hearing, and the plaintiff filed a § 1983 claim alleging deprivation of her Fourteenth Amendment due process rights. *Id*. at 309-10.

On appeal from the United States District Court for the Southern District of Ohio, the

4

defendants argued, *inter alia*, that the plaintiff could not recover under her due process claim "because an adequate state corrective judicial process existed." *Id*. at 315. The Sixth Circuit noted that "[w]hen a deprivation occurs through an established state procedure, 'then it is both practicable and feasible for the state to provide pre-deprivation process, and the state must do so regardless of the adequacy of any post-deprivation remedy,' whereas when a random and unauthorized deprivation occurs, 'the pre-deprivation procedures are simply impracticable and an adequate state post-deprivation remedy affords all the process that is due.'" *Id*. (quoting *Walsh v. Cuyahoga County*, 424 F.3d 510, 513 (6th Cir. 2005)). The Sixth Circuit then reasoned as follows:

> Silberstein was fired by an official action of the city's Civil Service Board after lengthy deliberation and consultation with attorneys. This was not a random, unauthorized deprivation, and Silberstein need not show that the state's post-deprivation corrective procedures were inadequate in order to allege adequately a deprivation of her due process rights.

*Id*.

Similarly, in the instant case, Plaintiffs were terminated after the State Court Administrative Office ("SCAO") performed a lengthy investigation of the 41B District Court in Clinton Township. Plaintiffs' terminations were recommended in a letter to Defendant sent at the conclusion of the investigation by the SCAO. Furthermore, Defendant was authorized by law to make personnel decisions as the Chief Judge of the 41B District Court, including hiring and firing of employees. Accordingly, Plaintiffs' terminations were not random or unauthorized deprivations. Defendant is therefore not entitled to a new trial based on Plaintiffs' failure to prove inadequate state law remedies.

**B. Jury Award**

*1. Compensable Damages*

5

Defendant argues that she is entitled to a new trial because the jury's damages award was not authorized by law.  Defendant further argues that, alternatively, Plaintiffs are entitled only to nominal damages in the amount of $1 for the deprivation of due process.

Defendant argues that Plaintiffs improperly focused on the impropriety of the employment decision and the behavior of Plaintiffs after the termination, rather than on the constitutional deprivation itself.  *See Howard v. Grinage*, 82 F.3d 1343, 1349-50 (6th Cir. 1996) ("Procedural due process claims do not implicate the egregiousness of the action itself, but only question whether the process accorded prior to the deprivation was constitutionally sufficient. . . . [T]he inquiry centers on the *process* provided, rather than on the nature of the *right*."  (emphasis in original)). Defendant's argument is entirely based on her own trial testimony, wherein she stated that Plaintiffs were terminated for dishonesty during the SCAO investigation, and that they were terminated at the direction of the SCAO.  Defendant argues that, based on her testimony, Plaintiffs would have been fired regardless of a pre-termination hearing, and are thus entitled to nothing more than nominal damages.

Defendant relies on *Carey v. Piphus*, 435 U.S. 247 (1978), for the proposition that a justified but procedurally deficient deprivation does not give rise to compensable injuries.  *Id*. at 263 ("[W]here a deprivation is justified but procedures are deficient, whatever distress a person feels may be attributable to the justified deprivation rather than to deficiencies in procedure.").  The *Carey* Court ultimately held that, "although mental and emotional distress caused by the denial of procedural due process itself is compensable under § 1983, we hold that neither the likelihood of such injury nor the difficulty of proving it is so great as to justify awarding compensatory damages without proof that such injury actually was caused."  *Id*. at 264.

6

In *Franklin v. Aycock*, 795 F.2d 1253 (6th Cir. 1986), the Sixth Circuit discussed the *Carey* holding regarding damages in a procedural due process case involving a right to public employment. The Sixth Circuit explained as follows:

> The issue of whether compensatory damages should be awarded can be separated into two separate inquiries. The first inquiry concerns causation; whether the action taken without due process is justified or, in other words, whether the same action would have been taken even if due process had been afforded. . . . In this case, the inquiry is whether Franklin would have been placed in disciplinary segregation even if he had received the required written statement from the Disciplinary Board. The second inquiry is whether there is proof of actual injury, such as emotional or mental distress caused by the denial of due process, to support an award of compensatory damages.

*Id*. at 1263. The Sixth Circuit also explained that, if the process is found to be defective, the defendant then has the burden on the second inquiry of proving that the lack of process was not the cause of the plaintiff's injury. *Id.*

In the instant case, Defendant bore the burden of showing that Plaintiffs would have been terminated with or without a pre-termination hearing. Defendant testified that she made the decision to terminate Plaintiffs' employment based on the SCAO's recommendation, that she had no idea what Plaintiffs said that was not truthful, but that she did not feel that she could disobey the SCAO's directive. (Jan. 6, 2012 Trial Tr. 49-50.) However, Defendant also testified that she was the ultimate decision maker, that she never requested additional information from the SCAO before terminating Plaintiffs' employment, and that she believed the directive from the SCAO was a reasonable directive. (Jan. 6, 2012 Trial Tr. 77, 90.) Further, Deborah Green, who conducted the interviews during the SCAO investigation, testified that she concluded the Plaintiffs lied because they could not recall certain information, but also testified that answering "I don't recall" or "I'm

not sure, I just don't remember right now" could have been true statements. (Jan. 9, 2012 Trial Tr.

25, 65.) As the Court noted in its December 3, 2012 Opinion and Order:

> Defendant Chief Judge Davis testified that she relied 100 percent on
> the dictate of the SCAO. The evidence at trial also established that
> the SCAO investigation had aspects of a "Keystone Cops"
> investigation: Deborah Green was often unable to identify with
> certainty from her notes, which employee said what at her interviews.
> Although Defendant Chief Judge Davis testified that previous-in-
> time, during the court merger process, she had asked Judge Cannon
> for a copy of his personnel policies and did not receive any, she did
> not at the time of the Plaintiffs' terminations conduct any due
> diligence that would have permitted her to make a proper
> determination of this critical issue.

(Dec. 3, 2012 Op. and Order at 24-25.)

Based on the testimony at trial, a reasonable juror could conclude that a pre-termination

hearing may have convinced Defendant that Plaintiffs were not actually dishonest during their

interviews, causing Defendant to disregard the SCAO directive. Accordingly, the jury's award of

compensatory damages for Plaintiffs was authorized by law. Furthermore, Plaintiffs submitted

evidence of their earnings prior to their terminations, and testified regarding their distress over

having their employment terminated at a moments notice without any explanation, which provided

a basis for the jury's award of compensable damages. The compensatory damages award is thus

supported by proof and will not be remitted. *See Denhof v. City of Grand Rapids*, 494 F.3d 534, 547

(6th Cir. 2007) (noting that "[a] jury verdict should not be remitted unless it is beyond the maximum

damages that the jury reasonably could find to be compensatory for a party's loss." (citation and

internal quotation marks omitted)).

2. *Punitive Damages*

The jury awarded each Plaintiff $160,000 in punitive damages, for a total punitive damages

award of $480,000.  Defendant argues that the jury improperly awarded punitive damages for behavior that occurred after Plaintiffs' terminations.  Defendant also argues that the punitive damages are constitutionally excessive.

"The purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 307 n. 9 (1986).  Punitive damages may be awarded in a § 1983 case provided that the plaintiff produces "a showing of the requisite intent." *Id*.

Defendant claims that Plaintiffs' counsel improperly argued for a punitive damages award that was premised on Defendant's behavior after the terminations occurred.  Specifically, Defendant argues that Plaintiffs' counsel's closing argument improperly referenced Defendant's statements to newspapers and to the Clinton Township Board of Directors, which were given after the terminations occurred.  In both cases, Defendant stated that Plaintiffs were terminated for lying.  Defendant also asserts that Plaintiffs' counsel improperly argued for an award of punitive damages based on the behavior of John Ferry, a non-party in this case.  Defendant argues that she is entitled to a new trial based on Plaintiffs' counsel's improper statements to the jury.

In her closing argument, Plaintiffs' counsel, Deborah Gordon, argued as follows regarding punitive damages:

> Here is my point.  If the head of the State Court Administrator's Office that Linda Davis says she relied on says this, he doesn't know what the lie is, how can you know what the lie is?  It's a very simple analysis.  Davis can't tell you what the lie is.  Ferry can't tell you what the lie is.  But yet you're somehow supposed to be here today deciding that my clients lied when these people, the experts, the investigators, have no idea.  Now, that is a pathetic joke, to ask you all to come to that conclusion when they freely admit they can't do it.

9

Members of the jury, this -- these answers, right here, did not stop this man, John Ferry, from going to the Michigan Supreme Court, as he testified, and reporting to the chief judge of the Michigan Supreme Court that my clients were fired for lying. Who the [sic] world does that to people, decent people? He admitted he went to the Michigan Supreme Court and said Nancy, Carol and Pat were fired for lying. He had no idea.

Now, this is just one of the things I wanted to talk to you about with regard to a particular jury instruction you're going to be given at the end of this case, and you're going to hear from the judge that in this case you can award something called punitive damages. These are damages to send a message and to punish and to make sure conduct like this from the government never happens again. And you will be told that you may award punitive damages if you find shocking conduct and it's necessary to set an example to deter others. I say to you, members of the jury, that this, all by itself, clearly shows punitive damages are necessary with regard to what happened to my clients, and that's just one little piece of it.

Chief Judge Linda Davis, the decision maker who tried not to be the decision maker for a long time, until she had no choice but to say she was the decision maker because of the law and the State Court Administrator's Office. So according to Judge Davis, who had complete authority to fire, she didn't know anything. She had no specifics. She didn't know what they lied about. Let me pull it out.

"I was not privy to the investigation or the particulars. I was not involved. It was up to the State Court Administrator's Office. I never saw any findings. I have no independent knowledge they were not truthful."

She has no independent knowledge. What does she do? She tells the newspapers Carol, Pat and Nancy are fired for falsifying information and lying. She goes to the Clinton Township Board of Directors meeting and on the public record tells the board that my clients were fired for lying. But she can't come in here to you and tell you what the lie is. She bumps it back to Green. "I just -- I don't know what Green told me. I just know she said whatever she said." Then why do you go to the media and ruin people's lives and reputations? Punitive damages, to send a message. This is reckless. Because if you can't -- I'm repeating myself now, but I think it's worth it. If you can't come into a court and raise your hand under oath and explain what the lie was, you best not be running to the

10

newspapers.

> And I have another question for Judge Davis other than why did you run around in public calling my clients liars when you can't articulate it here?  Why did you not give Carol, Pat and Nancy a single, solitary reason the day you called them in and fired them?  Nothing.  You remember what Pat said?  "I asked what I was not forthcoming about, and she went (indicating)."  How do you call people in and end their career like that?  Why do you not put anything in writing?  Why do you not demand more from the State Court Administrator's Office when it's your decision?

(Jan. 26, 2012 Trial Tr. 22-25.)

Plaintiffs' counsel was clearly not permitted to advocate for punitive damages based on John Ferry's behavior.  The Court may set aside a verdict based on improper statements made during closing argument "if there is a reasonable probability that the verdict was influenced by those arguments."  *Bridgeport Music, Inc. v. Justin Combs Pub.*, 507 F.3d 470, 478 (6th Cir. 2007) (citation omitted).  However, because Defendant did not object to Plaintiffs' counsel's remarks and did not ask for a curative jury instruction, and instead raised the issue for the first time in her Motion for New Trial, Defendant must show "a heightened degree of prejudice in order to grant a new trial."  *Id*.

Although Plaintiffs' counsel referenced the behavior of John Ferry in her punitive damages argument, the majority of her argument focused on Defendant's behavior.  Furthermore, it was permissible for Plaintiffs' counsel to attack Mr. Ferry's credibility, where he was a witness at trial and where Defendant testified that she relied on his statements when she made the decision to terminate Plaintiffs.  In addition, the Court properly instructed the jury that punitive damages were available only if "Plaintiff has proved by a preponderance of the evidence that the Defendant intentionally engaged in the unlawful actions with malice or with reckless indifference to the

11

Plaintiff's rights." (Jan. 26, 2012 Trial Tr. 138.) Accordingly, Defendant is not entitled to a new trial based on Plaintiffs' counsel's comments during closing argument.

Defendant also argues that punitive damages were improperly based on Defendant's conduct after the terminations, instead of her conduct at the time of the claimed due process violations. Plaintiffs argue that the jury was permitted to consider the course of Defendant's conduct, including conduct that occurred after the terminations, in determining that she acted with intent and malice. Plaintiffs rely on *E.E.O.C. v. Harbert-Yeargin, Inc.*, 266 F.3d 498 (6th Cir. 2001), for the proposition that a jury may award punitive damages for conduct by defendants that "was intended to disguise the retaliatory nature of their action from outsiders." *Id*. at 514 (citation omitted). The Court agrees. The jury was permitted to infer from Defendant's post-termination conduct in determining whether she acted with intentional malice, indifference, or reckless disregard when she terminated Plaintiffs without a hearing.

The jury had sufficient evidence to find that Defendant acted with malice or reckless indifference to the Plaintiffs' employment rights. Defendant Chief Judge Davis testified that she "had no idea what [Judge Cannon's] progressive discipline policy was[.]" (Jan. 4, 2012 Trial Tr. 87.) The testimony also showed that Defendant did not attempt to fully determine Judge Cannon's discipline policy prior to terminating the Plaintiffs. Furthermore, the testimony showed that Defendant relied fully on the SCAO's investigation and did not inquire as to the actual substance of Plaintiffs' alleged lies, nor did she give any of the Plaintiffs an opportunity to explain their allegedly dishonest answers before terminating them. This evidence at trial provided the jury with sufficient support for a finding of malice or reckless indifference regarding Defendant's conduct.

Defendant argues that, even if Plaintiffs are entitled to punitive damages, the amount

12

awarded – $160,000 for each Plaintiff, or $480,000 total – violates due process.

> The Supreme Court has set forth three factors to be considered in deciding whether a punitive-damages award is excessive: (1) "the degree of reprehensibility" of the conduct; (2) "the disparity between the harm or potential harm suffered by [the plaintiff] and [her] punitive damage award"; and (3) "the difference between [the punitive damages] and the civil penalties authorized or imposed in comparable cases."

*Arnold v. Wilder*, 657 F.3d 353, 369 (6th Cir. 2011) (alterations in original) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)); *see also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) (reaffirming the three factors in *Gore*).

Defendant contends that the punitive damages are too far in excess of the civil penalties authorized in this case. However, this argument is premised on Defendant's argument that compensable damages in this matter may not exceed one dollar. As discussed *supra* at pages 6-8, the Court declines to remit the jury's compensatory damages award. Thus, because the compensable damages awards in this matter are permissible, Defendant's argument that the punitive damages awards are too far in excess of the civil penalties is unavailing. Indeed, the punitive damages are less than the compensatory damages awarded by the jury.

Furthermore, the Court finds that the factors enunciated by the United States Supreme Court in *State Farm Mutual Auto Insurance v. Campbell*, *supra*, do not favor a finding that the punitive damages award is excessive.

*a. Reprehensibility*

The reprehensibility of a defendant's conduct is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award[.]" *Gore*, 517 U.S. at 575. In determining the reprehensibility of Defendant's conduct, the Court must consider whether:

13

> the harm caused was physical as opposed to economic; the tortious
> conduct evinced an indifference to or a reckless disregard of the
> health and safety of others; the target of the conduct had financial
> vulnerability; the conduct involved repeated actions or was an
> isolated incident; and the harm was the result of intentional malice,
> trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419.

Plaintiffs assert that the harm caused by Defendant's behavior was reputational and emotional. However, the majority of the harm in this matter was economic, not emotional and reputational. This is reflected in the jury's compensatory damages award, which gave Plaintiff Englar $508,927 in economic damages, Plaintiff Diehl $455,849 in economic damages, and Plaintiff Barachkov $382,912 in economic damages, but awarded only $150,000 to each Plaintiff in non-economic damages. (Verdict Form at 2-3.) Furthermore, Defendant's decision to terminate Plaintiffs was predominantly an economic injury, and much of the emotional harm "arose from a transaction in the economic realm, not from some physical assault or trauma; there were no physical injuries[.]" *State Farm*, 538 U.S. at 426. The harm caused by Defendant's behavior was predominantly economic, not physical, and it does not evince an indifference to or a reckless disregard of the health and safety of others.

Nevertheless, while the harm caused was predominantly economic, Plaintiffs were financially vulnerable. At the time of their terminations, Plaintiff Englar was earning approximately $50,000 per year (Jan. 17, 2012 Trial Tr. at 129), Plaintiff Diehl was earning approximately $46,000 per year (Jan. 19, 2012 Trial Tr. at 21), and Plaintiff Barchkov was earning approximately $37,000 per year (Jan. 11, 2012 Trial Tr. at 182). Plaintiffs Diehl and Barachkov were in their mid-50s when they were terminated, and Plaintiff Englar was in her mid-40s. None of the Plaintiffs were eligible for retirement benefits. All three testified that they had difficulty finding other employment. The

United States Court of Appeals for the Sixth Circuit has noted that an employee may be financially vulnerable where "[He] was terminated a few years before his pension would have fully vested[,] . . . was approximately 50 years old when his employment was terminated[,] . . . [and had] difficulty obtaining other employment[.]" *Morgan v. New York Life Ins. Co.*, 559 F.3d 425, 441-42 (6th Cir. 2009). Based on Plaintiffs' age and income at the time of their terminations, and their difficulty in finding work after their terminations, the Court finds that they were financially vulnerable.

Defendant's conduct was not an isolated incident, because she terminated each Plaintiff individually.

Furthermore, as discussed *supra*, the jury had evidence that Defendant acted with intentional malice. While Defendant continues to argue that she merely made a mistake of fact, this argument was rejected by the jury. Furthermore, although the facts do not support a strong showing of malice, Defendant's conduct is sufficient to support the punitive damages awarded. *See Bridgeport Music*, 507 F.3d at 486-87 (noting that, while there was "not a strong showing of intentional malice or deceit, defendants' conduct was still somewhat reprehensible[,]" and holding that "[i]n this case where only one of the reprehensibility factors is present, a ratio in the range of 1:1 to 2:1 is all that due process will allow.").

The jury awarded Plaintiffs $1,797,688 in compensatory damages, and $480,000 in punitive damages. The punitive damages award is thus less than one-third of the total compensatory damages award. The Court finds that the reprehensibility factors in this matter are sufficient to support the punitive damages award.

*b. Disparity*

The disparity between the compensatory and punitive damages awards is within the realm

15

permitted by due process.  The Supreme Court has explained that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."  *State Farm*, 538 U.S. at 425.  Here, the punitive damages award is less than .27:1, well within the 1:1 ratio that may represent "the outermost limit of the due process guarantee."

*c. Civil Penalties Comparison*

Other similar cases support the amount of punitive damages awarded in this case.

Plaintiffs cite the recent case *Pucci v. Somers*, 834 F. Supp. 2d 690 (E.D. Mich. 2011), which involved a claim that the defendant, the Chief Judge of the Nineteenth District Court in Dearborn, Michigan, violated the plaintiff's procedural due process rights when the plaintiff was terminated from her job at the court.  *Id*. at 694.  The jury awarded $534,361 in compensatory damages and $200,000 in punitive damages.  *Id*.  The Court found that the damages award was supported by the evidence, although it also noted that the defendant "[did] not challenge[] the punitive damage awards on grounds that they are excessive or violate due process."  *Id*. at 699.

Plaintiffs also cite *Horton v. 48th District Court*, 446 F. Supp. 2d 756 (E.D. Mich. 2006), which involved a similar procedural due process claim.  In that case, the "wrongful discharge claim [was] based on [the plaintiff's] assertion that Defendants maintained written policies that gave rise to a legitimate expectation that her employment would not be terminated without just cause."  *Id*. at 760-61.  The jury awarded $494,000 in compensatory damages and $500,000 in punitive damages on the plaintiff's due process claim.  (Pls.' Resp., Ex. D, *Horton v. 48th District Court* Jury Verdict Form at 3, 5.)

Accordingly, it is clear that juries have awarded between $200,000 and $500,000 in punitive

16

damages for a single violation of a plaintiff's procedural due process rights in similar cases. In the instant case, the jury awarded $160,000 in punitive damages for each procedural due process violation, for a total award of $480,000. The Court finds this award is within the amount awarded in similar cases.

Defendant cites *Schreffer v. Board of Education of Delmar School District*, 506 F. Supp. 1300 (D.C. Del. 1981). In that case, "[t]he jury awarded the plaintiff $113,000 as compensatory damages and $77,500 as punitive damages . . . ." *Id*. at 1302. The United States District Court for the District of Delaware found "that the reckless disregard suggested by the record, though enough to require submission of the issue to the jury, was not even remotely sufficient to justify the size of the punitive damage award . . . ." *Id*. at 1310. The court further noted as follows:

> The testimony at trial established that the Board members devoted about ten to twelve hours of time a month to school affairs and served in their capacities without pay. Moreover, there was no evidence in the record demonstrating that the members of the Board were anything but conscientious civic minded citizens prior to the occurrence of the circumstances of this case. Accordingly, . . . the exorbitant penalties imposed by the jury will more likely inure to the public's detriment by unnecessarily deterring these defendants and other responsible citizens from serving in the voluntary capacity of members of the Board.

*Id*. at 1311.

By contrast, Plaintiffs' counsel argued at trial that the Defendant was far from a conscientious civic minded citizen, claiming that she sought to remove Judge Cannon for political advantage, and Plaintiffs' terminations were intended to pressure Judge Cannon to resign. As discussed *supra*, while the record may not demonstrate a strong case for Defendant's alleged political motive, the jury was free to accept or reject the parties' arguments on this issue. *See Bridgeport*, 507 F.3d at 486 (noting that "[t]he jury, however, rejected [the defendants'] arguments

17

and found that defendants acted willfully.").

*Morgan v. Ward*, 699 F. Supp. 1025 (N.D.N.Y. 1988), also cited by Defendant, was tried to the court in a non-jury trial. *Id*. at 1030. The court found "no evidence that these deficiencies [in the defendants' proceedings] resulted from an intention on the part of correctional officials to deny inmates housed in [a special housing unit] their due process rights, nor were they designed as a pretext for unfairly punishing unpopular inmates." *Id*. at 1046. The court thus did not award punitive damages. *Id*.

Unlike *Morgan*, the finder of fact in the instant case – the jury – found that the evidence in the record was sufficient to show that Defendant intentionally engaged in the unlawful conduct. The Court thus finds *Morgan* distinguishable.

The Court also finds distinguishable Defendant's third case, *Merritt v. De Los Santos*, 721 F.2d 598 (7th Cir. 1983). That case also involved a bench trial, which resulted in nominal damages of $1 and punitive damages of $100. *Id*. at 600. The punitive damages award was affirmed by the United States Court of Appeals for the Seventh Circuit. *Id*. at 602.

In the instant case, the jury properly awarded more than nominal damages. Furthermore, the punitive damages award in *Morgan*, which was higher than the compensatory damages award, was upheld. The Court therefore finds that *Morgan* does not support remittitur of the punitive damages award in the instant case.

The Court finds that similar cases support the jury's award of punitive damages.

*d. Conclusion*

Balancing the three factors set forth in *State Farm*, *supra*, the Court finds that the punitive damages award comports with due process. Although the evidence of Defendant's intentional

18

misconduct is not strong, the Court notes that the punitive damages awarded are only a fraction of the substantial compensatory damages awarded in this matter. Accordingly, the Court will deny Defendant's Motion to Amend the Judgment Regarding Damages.

## C. Evidence Not Admitted

Defendant argues that she is entitled to a new trial because she was unfairly prejudiced when the Court excluded from trial an "Employee Discipline Notice" written to a 41B District Court employee that described the employee as "at-will." The Notice stated that 41B District Court employee Danielle Carroll was disciplined for violating the terms of use for the Law Enforcement Information Network ("LEIN") System, and further noted: "[a]s an at-will employee you can be terminated with or without cause." Although it was first produced just weeks prior to trial, Defendant attempted to have the Notice admitted as Exhibit 576.

Federal Rule of Civil Procedure 61 provides that "no error in admitting or excluding evidence . . . is ground for granting a new trial." Defendant is not entitled to a new trial unless an error resulted in some unfairness at trial, "i.e., the proceedings being influenced by prejudice or bias." *Holmes v. City of Massilon, Ohio*, 78 F.3d 1041, 1046 (6th Cir. 1996).

Exhibit 576 involved a non-party employee of the 41B District Court, and was not signed by Judge Cannon, whose employment practices were at issue in the instant case. Furthermore, the Notice was not produced during discovery. Defendant's counsel claimed that the Notice was first discovered during trial preparation. Plaintiffs' counsel was thus prevented from deposing Judge Cannon about the document, or the employee who received the document, Danielle Carroll, or the supervisor who signed the document. Therefore, any probative value that the Notice might have had at trial was outweighed by unfair prejudice to Plaintiffs. *See* Fed. R. Evid. 403.

19

Moreover, although the document itself was not produced into evidence, two witnesses at trial testified to its contents, and specifically noted that it classified employees at the 41B District Court in Clinton Township as "at-will." Charles Towner, labor counsel for Judge Cannon and the 41B District Court, testified as follows:

> Q.    Now, tell the jury what the employees were disciplined for that -- in the one that you participated.
>
> A.    There was a violation for what's called the LEIN network where at the court they had access to people's driving records, addresses, and there was an investigation regarding a couple of the employees that had inappropriately did that for their own personal use.
>
> ( . . . . )
>
> Q.    Okay. At the time that the discipline was imposed were the employees asked to sign a disciplinary notice of some kind?
>
> A.    I believed they signed something with respect to what their final discipline was, yes.
>
> Q.    And in that notice or in that document, were these employees advised of their employment status?
>
> A.    Yes, they were told they were at will.
>
> ( . . . . )
>
> Q.    Did you participate in the preparation of the document?
>
> A.    I believe I did, yes.
>
> Q.    And did Judge Cannon participate in the preparation of the document?
>
> A.    Yes, he did.
>
> Q.    And did the document indicate the employees' status?
>
> A.    It did.

( . . . . )

Q.      Did the document address the employees' status?

A.      It did.

Q.      What did it provide?

( . . . . )

A.      It indicated that their status was at will regardless of the discipline imposed.

BY MR. FERRAND:
Q.      That their status was what, sir?

A.      At will.

(Jan. 20, 2012 Trial Tr.79, 81-83.)

The former Deputy Court Administrator for the 41B District Court, Eric Cyman, also testified regarding the Employee Discipline Notice, as follows:

Q.      Mr. Cyman, would you turn to Exhibit 567 [sic] in your book. . . . And, sir, you were just asked a couple of questions about disciplining you participated in as it relates to the misuse of the LEIN system, correct?

A.      Correct.

Q.      And as it relates to that discipline, is 567 [sic] the discipline notice that was put out to those employees?

A.      Yes, it is.

Q.      And does that discipline notice address the employees' at-will status?

A.      It does.

( . . . . )

Q.      And does this document, after reviewing it, refresh your

21

        recollection of specifically what they were told about their at-will status?

A.      Yes, it does.

Q.      What were they told about their at-will status?

A.      Well, they were told that they could be terminated with or without cause, and in the meeting with each employee, they were also told that, even though they were being terminated, their conduct should be good moving forward and that their status remains at will.

(Jan. 23, 2012 Trial Tr. 89-91.)

Accordingly, the Court finds that exclusion of Exhibit 576 did not result in such unfairness as to entitle Defendant to a new trial.

**D.  Defendant's Motion for Clarification/Relief From Judgment or Order**

Defendant's Motion for Clarification seeks clarification for the basis of the Court's denial of her Motion for New Trial.  The Court has addressed the arguments of Defendant's Motion for New Trial or Motion to Amend the Judgment Regarding Damages in the instant Opinion.  The Court will therefore deny Defendant's Motion for Clarification/Relief From Judgment or Order.

## IV.  CONCLUSION

For the reasons stated above, the Court will:

(1) **DENY** Defendant's Motion for New Trial or to Amend the Judgment Regarding Damages, and

(2) **DENY** Defendant's Motion for Clarification/Relief From Judgment or Order.

**SO ORDERED**.

S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  February 15, 2013

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on
February 15, 2013.

S/Denise Goodine
Case Manager

23